**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: May 31, 2023

S23A0017. RAFFENSPERGER v. JACKSON et al.
S23X0018. JACKSON et al. v. RAFFENSPERGER.

BOGGS, Chief Justice.

In 2018, Mary Jackson and a nonprofit organization, Reaching Our Sisters Everywhere, Inc. ("ROSE"), filed a complaint against the Secretary of State ("the Secretary"),[1] challenging the constitutionality of the Georgia Lactation Consultant Practice Act ("the Act"), OCGA §§ 43-22A-1 to 43-22A-13. Under the Act, the Secretary issues licenses authorizing lactation care providers to provide lactation care and services for compensation. Only lactation care providers who obtain a privately issued certification as an

---

[1] At the time the suit was filed, Brian Kemp was Secretary of State, and he agreed to stay enforcement of the Act during the pendency of the suit. After Kemp was elected Governor, the parties agreed to substitute current Secretary of State Brad Raffensperger as the defendant, and Secretary Raffensperger also agreed to stay enforcement of the Act until the conclusion of the case, including any appeals.

International Board Certified Lactation Consultant ("IBCLC") are eligible to obtain a license. Jackson and ROSE (collectively "Plaintiffs") allege that their work includes the provision of lactation care and services and that the Act is irrational and lacks any real and substantial connection to the public health, safety, or welfare because there is no evidence that non-IBCLC providers of lactation care and services have ever harmed the public. They also contended that the Act will require them to cease practicing their chosen profession, thus violating their rights to due process and equal protection under the Georgia Constitution. See Ga. Const. 1983, Art. I, Sec. I, Pars. I and II. In the first round of this litigation, the trial court granted the Secretary's motion to dismiss for failure to state a claim, but this Court reversed and remanded with direction. See *Jackson v. Raffensperger*, 308 Ga. 736 (843 SE2d 576) (2020) ("*Jackson I*").

Following remand, the Secretary withdrew his motion to dismiss, and the parties engaged in discovery and filed cross-motions for summary judgment. On the due process claim, the trial

2

court granted the Secretary's motion for summary judgment, and on the equal protection claim, the trial court granted Plaintiffs' motion for summary judgment. The Secretary appealed, and Plaintiffs filed a cross-appeal. For the reasons detailed below, we conclude in the cross-appeal that the Act is unconstitutional on due process grounds and that the trial court therefore erred in granting summary judgment to the Secretary and denying it to Plaintiffs. Accordingly, we reverse the trial court on the due process claim and do not reach the equal protection claim raised in the main appeal.[2]

1. The background facts are undisputed. Lactation care providers provide direct support to mothers in breastfeeding their babies. While lactation care providers can make a living providing their services, some volunteers also provide such support. Lactation care providers may obtain certification from various private accrediting entities, including the International Board of Lactation

[2] The Court thanks Drs. Kleiner, Plemmons, and Timmons, Occupational Licensing Scholars; Healthy Children Project, Inc.; Mom2Mom Global; National Lactation Consultant Alliance, Inc. and Georgia Perinatal Association; Pacific Legal Foundation and The Goldwater Institute; and Southeastern Lactation Consultants Association for their briefs amicus curiae.

Consultant Examiners, which began granting the IBCLC certification in 1985, and the Healthy Children Project, Inc., which began granting certification as a Certified Lactation Counselor ("CLC") in 1992. IBCLC certification may be obtained in three different pathways, each of which requires that a person pass a written examination and complete 14 courses in health sciences, eight of which must be college-level courses;[3] 95 hours of lactation-specific education, including five focused on communication skills; and at least 300 supervised clinical hours. The IBCLC examination costs approximately $600-$700. The IBCLC program is accredited by the National Commission for Certifying Agencies. There are approximately 470 IBCLCs in Georgia, only 162 of whom have obtained licenses under the Act.

---

[3] According to the affidavit of the Secretary's expert, the eight required college-level courses are biology; human anatomy; human physiology; infant and child growth and development; introduction to clinical research; nutrition, psychology, counseling skills, or communication skills; and sociology, cultural sensitivity, or cultural anthropology. The other six courses, which may be completed as continuing education courses, are basic life support, medical documentation, medical terminology, occupational safety and security for health professionals, professional ethics for health professionals, and universal safety precautions and infection control.

To earn CLC accreditation, one must complete a 52-hour course; demonstrate competency in breastfeeding assessments, counseling, teaching, infant weight gain, contraindications, and the CLC Code of Ethics; and pass a written examination, which costs approximately $120.[4] The CLC course is accredited by the National College Credit Recommendation Service, and its examination is accredited by the American National Standards Institute. There are currently approximately 735 CLCs in Georgia.

Lactation care providers can also receive education from organizations such as ROSE. ROSE, which was founded in 2011, trains individuals to provide breastfeeding education and support to

---

[4] According to the affidavit of Plaintiffs' expert,

The CLC course covers breastfeeding management and the underlying knowledge of anatomy and physiology that supports the clinical skills needed for breastfeeding management. Topics include, but are not limited to, theoretical foundations of milk composition and milk production; health outcomes associated with infant feeding choices; hand expression; milk storage and handling; milk banking; contraindications to feeding human milk; counseling; maternity care practices that influence breastfeeding outcomes; assessing the breastfeed; breast problems; working [while breastfeeding]; family planning; special challenges; effect of foods and drugs; ages and stages of child development and infant feeding; ethics; disparity in outcomes; and the Baby-Friendly Hospital Initiative.

mothers, primarily in African-American communities, through a research and evidence-based curriculum in a free 16-hour course. Approximately 1000 individuals have participated in ROSE's training course.

In 2013, the General Assembly first considered a bill that would require lactation care providers to be licensed through the Secretary. See House Bill 363 (2013). Pursuant to OCGA § 43-1A-5 (a) (1), the Georgia Occupational Regulation Review Council ("Review Council") reviewed the proposal and unanimously recommended against passage, and the 2013 bill did not become law.[5]

In 2016, the General Assembly passed the Act, which is substantially similar to the 2013 bill. The Review Council did not review the Act prior to its passage. The General Assembly included the following statement of purpose in the Act:

> The General Assembly acknowledges that the application of specific knowledge and skills relating to breastfeeding is important to the health of mothers and babies and

---

[5] The law establishing the Review Council, see OCGA § 43-1A-1 et seq., has been repealed. See 2023 Ga. Laws Act 57 (HB 76) (May 1, 2023).

acknowledges further that the rendering of sound lactation care and services in hospitals, physician practices, private homes, and other settings requires trained and competent professionals. It is declared, therefore, to be the purpose of this chapter to protect the health, safety, and welfare of the public by providing for the licensure and regulation of the activities of persons engaged in lactation care and services.

OCGA § 43-22-2A. The Act defines "lactation care and services" as "the clinical application of scientific principles and a multidisciplinary body of evidence for evaluation, problem identification, treatment, education, and consultation to childbearing families regarding lactation care and services," OCGA § 43-22A-3 (5), and provides a nonexhaustive list of lactation care and services. Under the Act, "[l]actation care and services shall include, but not be limited to:"[6]

    (A)   Lactation assessment through the systematic collection of subjective and objective data;
    (B)   Analysis of data and creation of a lactation care plan;
    (C)   Implementation of a lactation care plan with demonstration and instruction to parents and

---

[6] By specifying that the named services "shall include, but not be limited to," the list is not exhaustive. Compare *Premier Health Care Investments, LLC v. UHS of Anchor, L.P.*, 310 Ga. 32, 45 (849 SE2d 441) (2020) (concluding that General Assembly's use of "including but not limited to" in a statute introduced a list of illustrative examples rather than an exhaustive list).

communication to the primary health care provider;

(D)   Evaluation of outcomes;

(E)   Provision of lactation education to parents and health care providers; and

(F)   The recommendation and use of assistive devices.

Id. Under OCGA §§ 43-22A-3 (6), 43-22A-6, and 43-22A-7, the Secretary may grant a license as a "lactation consultant" only to a person who has obtained an IBCLC certification or who holds a license issued by another jurisdiction if the requirements for that license are equal to or greater than the requirements of the Act. And under OCGA § 43-22A-11, "no person without a license as a lactation consultant issued pursuant to this chapter shall . . . practice lactation care and services," unless one of the exemptions set forth in OCGA § 43-22A-13 applies.[7] Anyone who provides lactation care and services for compensation without a license may be subjected to injunction proceedings in superior court. See OCGA § 43-1-20.[8]

---

[7] See n.12, below.

[8] The general provisions of Title 43, which governs professions and businesses, authorizes professional licensing boards to enter cease-and-desist orders against the unlicensed practice of a profession without a license and to impose a fine of up to $500 for the violation of a cease-and-desist order. See OCGA § 43-1-20.1 (b). The Act authorizes the Secretary to impose sanctions on *licensed* lactation consultants. See OCGA §§ 43-22A-10, -12.

Jackson is a CLC and is employed by a hospital, where her job duties include providing services that fall within the Act's definition of "lactation care and services," including counseling mothers about breastfeeding, assessing breastfeeding challenges, creating and implementing lactation care plans, evaluating breastfeeding outcomes, assisting mothers with babies in the neonatal intensive care unit with breastfeeding help, and helping mothers use various tools, such as breast pumps. After the Act was passed, she was informed by her supervisor that she would not be permitted to continue doing the same job duties.

ROSE employs CLCs and also trains individuals to provide lactation care services directly to mothers, including breastfeeding assessment, education, and support. ROSE offers lactation care and services to mothers without cost, and while some of the individuals trained by ROSE work as volunteers, others are paid for their work by ROSE.

2. In considering Plaintiffs' challenges to the Act, we begin with the standard of review. Our review of the trial court's order is de

novo because this appeal is from a ruling on cross motions for summary judgment and raises a legal question as to the constitutionality of a law. See *Polo Golf & Country Club Homeowners Assn. v. Cunard*, 310 Ga. 804, 809 (854 SE2d 732) (2021) ("Our review of the grant or denial of a motion for summary judgment is de novo."); *State v. Holland*, 308 Ga. 412, 414 (841 SE2d 723) (2020) ("[W]e review de novo the trial court's conclusion regarding the constitutionality [of a statute]").

But the issues presented are not wholly legal, as the parties presented evidence for the trial court's consideration on the motions for summary judgment. Therefore, in considering the propriety of the trial court's ruling on either motion, we view the evidence in the light most favorable to the nonmovants. Because we conclude that the trial court erred not only in granting summary judgment for the Secretary on the due process claim, but in denying it to Jackson and ROSE, we apply the same standard to Plaintiffs' motion, and view the evidence in the light most favorable to the Secretary. See *Chandler v. Robinson,* 269 Ga. 881, 882-883 (506 SE2d 121) (1998)

10

(concluding on review of cross-motions for summary judgment "that the undisputed facts, even when viewed in a light most favorable to [the losing party], show an absence of genuine issue as to any material fact, and [therefore the prevailing party was] entitled to summary judgment as a matter of law"), disapproved of on other grounds by *Shearin v. Wayne Davis & Co.* 281 Ga. 385 (637 SE2d 679) (2006).

S23X0018

3. We now turn to the issues presented in the cross-appeal. Plaintiffs contend that the trial court erred in granting the Secretary's motion for summary judgment on their due process claim. They assert that the Act violates their due process rights because it precludes them from practicing their lawful, chosen profession as providers of lactation care and services. The Secretary, for his part, contends that the Act does not preclude Plaintiffs from pursuing their profession and that, regardless, the General Assembly's choice to license only ICBLCs to provide lactation care and services is rationally related to the Act's stated purpose of

11

"protect[ing] the health, safety, and welfare of the public," OCGA § 43-22A-2, and by promoting access to quality care.

The Georgia Constitution's Due Process Clause provides that "[n]o person shall be deprived of life, liberty, or property except by due process of law." Ga. Const. of 1983, Art. I, Sec. I, Par. I.[9] We have "long recognized" that this provision "entitles Georgians to pursue a lawful occupation of their choosing free from unreasonable government interference." *Jackson I*, 308 Ga. at 740. We discerned this right not merely from precedent, but also as a "consistent and definitive" understanding of Georgia's Due Process Clause. See *Elliott v. State*, 305 Ga. 179, 184 (II) (B) (824 SE2d 265) (2019) ("A constitutional clause that is readopted into a new constitution and that has received a consistent and definitive construction is presumed to carry the same meaning as that consistent construction."). Across each successive Constitution following the

---

[9] The language of the Due Process Clause has remained materially the same for these purposes since it first appeared in the Georgia Constitution of 1861. See *State v. Turnquest*, 305 Ga. 758, 769 (827 SE2d 865) (2019) (tracing language of Due Process Clause through Constitutions of 1861, 1868, 1877, 1945, 1976, and 1983).

addition of the Due Process Clause in 1861, we articulated a consistent and definitive understanding of how the Due Process Clause applied to occupational licensing and the ability to pursue a lawful occupation. This understanding begins as far back as 1896, *Odell v. City of Atlanta*, 97 Ga. 670 (25 SE 173) (1896), past the turn of the century, *Bazemore v. State,* 121 Ga. 619, 620 (49 SE2d 701) (1905), through the 1930s, *Southeastern Elec. Co. v. City of Atlanta*, 179 Ga. 514 (1934) and *Bramley v. State*, 187 Ga. 826, 832 (2 SE2d 647) (1939), the 1950s and 1960s, *Jenkins v. Manry*, 216 Ga. 538, 541-546 (1) (118 SE2d 91) (1961), all the way up to the middle of the committee meetings to revise Article 1 of the Constitution, *Rockdale County v. Mitchell's Used Auto Parts, Inc.*, 243 Ga. 465, 465 (254 SE2d 846) (1979); Transcripts of Mtgs., Committee to Revise Article I, Vol., 1 (Meetings 1977-1981). Our cases, in sum, display a consistent and definitive understanding of the Constitution's Due Process Clause, reaffirmed at least once under the 1945 Constitution's Due Process Clause, and referenced approvingly

13

under the short-lived 1976 Constitution.[10] Thus, "[the] history reveal[s] a consistent and definitive construction" of the Due Process Clause, "whose words remain materially unchanged since [they] first appeared" in their present form, and (since we have been offered no evidence to the contrary) "we presume[] that construction was carried forward into the 1983 constitution." *Elliott*, 305 Ga. at

---

[10] We have also decided a number of strikingly similar cases in this stretch that either did not directly tie themselves to the Due Process Clause, or cited the Equal Protection Clause instead. See, e.g., *Cooper v. Rollins*, 152 Ga. 588, 590-591 (110 SE 726) (1922) (a law requiring barbers, not other professionals in "trades involving manual labor," to get a license, was not irrational and therefore did not violate equal protection; the state had the "police power" to require a license for barbers, and "[t]he health of the citizens as affected by diseases spread from barber shops conducted by unclean and incompetent barbers is justification for such laws," so the legislature could do that "without requiring the members of all other trades or occupations to be so examined and licensed."); *Gregory v. Quarles*, 172 Ga. 45, 47-48 (157 SE2d 306) (1931) (a law requiring plumbers to obtain a license before working on new plumbing, but not existing plumbing, violated equal protection: "there is respectable authority for saying that, since a city may easily protect itself against the consequences of bad plumbing by a system of inspecting the work itself, rather than by limiting the number of persons who shall engage in it, those statutes and ordinances which provide that none but examined and licensed persons shall engage in plumbing skirt pretty closely that border line beyond which legislation ceases to be within the powers conferred by the people of the state upon its legislative bodies." (cleaned up)).

That is significant because, at the time, our cases also suggested that the related equal protection attack on occupational licensing was "so intimately connected" with the due process inquiry as to "not require separate consideration." *Bramley,* 187 Ga. at 832; see also *Southeastern Elec.,* 179 Ga. at 514 (concluding that the same examination requirement for electrical contractors violated both due process and equal protection).

185 (II) (B).

The contours of the right we reaffirmed in *Jackson I*, as shown by this consistent and definitive understanding, are as follows. It is "the common inherent right of every citizen to engage in any honest employment he may choose, subject only to such restrictions as are necessary for the public good." *Bramley*, 187 Ga. at 834-835. "The [constitutional] regulation of a lawful business . . . is dependent upon some reasonable necessity for the protection of [1] public health, [2] safety, [3] morality, [4] or other phase of the general welfare; and unless an act restricting the ordinary occupations of life can be said to bear some reasonable relation to one or more of these general objects of the police power, it is repugnant to constitutional guarantees and void." Id. at 835. So, for example, "an unjust discrimination between classes of persons" will often violate the disfavored class's rights, particularly if "the actions of one class in following the vocation . . . would affect the [government's interests] as materially as the actions of the other class." *Jenkins,* 216 Ga. at 541-546.

To be clear, this does not mean the right is concerned with invidious discrimination along the lines of modern equal protection analysis. Instead, it is concerned with the imposition of arbitrary (i.e., not reasonably necessary) burdens on the ability to pursue a lawful occupation. Disparate treatment is not the violation itself; it is evidence of the violation — if a similarly situated person is able to pursue the occupation competently, then the burden imposed on the person who is prohibited from pursuing the occupation is likely not reasonably necessary to the State's interest in health and safety. See *Jenkins*, 216 Ga. at 545-546. ("There is no reasonable basis for requiring the examination and licensing of plumbers and steam fitters who are not employees of public utility corporations, and exempting employees of public-utility corporations operating in the territory covered by the act"); *Southeastern Elec.*, 179 Ga. at 514 (an ordinance regulating electrical contractors and requiring them to pass examinations depending on whether they performed their work in new buildings versus existing buildings was so arbitrary and so standardless that it violated due process and equal protection).

Although we have previously considered a number of constitutional challenges to occupational licensing schemes, we have not identified a specific framework to apply in considering such challenges under the Georgia Constitution. And our early case law addressing such challenges often failed to carefully distinguish the constitutional claims asserted. See, e.g., *Bramley*, 187 Ga. at 832 (state and federal due process and equal protection challenges to statute requiring licensure of photographers presented "substantially a single question"). Nevertheless, this case law, which we discuss further below, and case law addressing due process challenges to statutes in other contexts, provides helpful guidance and allows us to establish a framework for considering the challenge here.

First, in order to establish that the Act violates their due process rights under the Georgia Constitution to pursue their chosen occupation free from unreasonable government interference, challengers bear the burden of establishing that the Act "manifestly infringes upon a constitutional provision or violates the rights of the

17

people." *Brodie v. Champion*, 281 Ga. 105, 106 (636 SE2d 511) (2006); see also *Zarate-Martinez v. Echemendia*, 299 Ga. 301, 305 (788 SE2d 405) (2016) (burden is on the party challenging the constitutionality of statute). In the context of a challenge to an occupational licensing scheme, this first step requires the challenger to establish two things.

The challenger must show that the occupation sought is, at a minimum, lawful but for the challenged restriction. *Jackson I*, 308 Ga. at 740 (2) (collecting cases describing the right as pursuing a *lawful* occupation free from unreasonable government interference); see also *Odell*, 97 Ga. at 671 ("[T]he keeping of an establishment for the purpose of enabling persons to bet upon horse-races is not a useful or necessary occupation which any citizen has either a common law or constitutional right to carry on."); *Schlesinger v. City of Atlanta*, 161 Ga. 148, 159 (129 SE 861, 866) (1925) (the right to pursue a lawful occupation "has no application to the inhibition of that which the individual has no natural or inherent right to do. If the individual has no such inherent right to conduct the business of

18

a common carrier by jitneys or busses upon the streets of the city, his case does not fall within this principle.").

And the challenger must also show that the regulation "unreasonabl[y] . . . interfere[s]" with the ability "to pursue a lawful occupation of their choosing free from unreasonable government interference[.]" *Jackson I*, 308 Ga. at 740 (2) (emphasis added); see also *Bramley*, 187 Ga. at 832 (the defendant in a criminal prosecution for violating occupational licensing restrictions on photographers successfully argued that "the statute on which the accusation was based [was] unconstitutional and void" because it was "an arbitrary and unreasonable interference with a lawful and harmless business").

These two showings — that an occupation is otherwise lawful and that a regulation unreasonably burdens the ability to pursue it — are the indispensable elements of a claim that a given law violates the right to pursue a lawful occupation free from unreasonable government interference.

In the second step in the framework, the government must

offer a legitimate interest behind the regulation justifying some interference with the ability to pursue the occupation. This is not an open-ended exercise in interest-balancing — our consistent and definitive understanding of the Due Process Clause shows well-settled limits on what government interests are sufficient for these purposes: a burden on the ability to practice a lawful occupation is only constitutional if it is reasonably necessary to advance an interest in health, safety, or public morals. See *Bramley,* 187 Ga. at 835-836 (listing government interests as "health, safety, morality, or other phase of the general welfare"); *Jenkins,* 216 Ga. at 540 ("The right to work and make a living . . . . may be abridged to the extent, and *only* to the extent, that is necessary reasonably to insure the public peace, safety, health, and like words of the police power." (emphasis added) (quoting *Richardson v. Coker*, 188 Ga. 170, 175 (3 SE2d 636) (1939)). And while this same understanding does not require the challenger to disprove "any reasonably conceivable state of facts that could provide a rational basis for the classification," as the rational basis test does under federal law, see *FCC v. Beach*

*Comms., Inc.* 508 U.S. 307, 313 (II) (113 SCt 2096, 124 LE2d 211) (1993), neither does it call on courts to analyze whether a justification offered in litigation is the "real" one. See, e.g., *Cooper v. Rollins*, 152 Ga. 588, 593-594 (110 SE 726) (1922); *Bramley*, 187 Ga. at 838-839; *Jenkins*, 216 Ga. at 540. There is no requirement that the government must compile or offer evidence in the course of enacting such a regulation, nor that the government defend such an act solely by reference to some purported legislative intent.

Conversely, this same consistent and definitive understanding makes clear that certain interests are decidedly *not* sufficient to justify a burden on the ability to practice a lawful profession. These include (1) protectionism and (2) generic interests of quality or honesty of goods and services, especially when this latter sort of interest is unmoored from the particular profession — i.e., when the given profession does not create special need to deal with the quality or honesty of goods and services, but shares those risks on the same terms as some other business not so regulated. See, e.g., *Bramley*, 187 Ga. at 836 (speaking of licensing photographers: "No business,

21

however innocent and harmless, is entirely free from the possibility of becoming, under improper or dishonest management, in some degree inimical to the public interest . . . . If this should be held to be a sound argument[,] the police power could be used to lay upon any business, however unrelated to the general welfare, [and however] burdensome and unreasonable [the] restrictions." (cleaned up)); see also *Moultrie Milk Shed v. City of Cairo*, 206 Ga. 348, 352 (57 SE2d 199) (1950) ("[O]ne engaged in a lawful business injurious to no one must not be arbitrarily prevented from the legitimate prosecution of his business by city ordinances which set up trade barriers solely for the purpose of protecting a resident against proper competition."). In short, once the challenger has made a prima facie case, the government must offer (but not necessarily prove the veracity or efficacy of) a specific interest in health, safety, or public morals. If the government fails to offer such an interest, or offers only an illegitimate interest, the regulation violates the right to pursue an occupation free from unreasonable government

22

interference. See *Bramley,* 187 Ga. at 834, 838.[11]

Third, and finally, the challenger has the ultimate burden to prove that the regulation unreasonably interferes with her right to practice the occupation of her choosing. Because statutes are presumed to be constitutional, this burden starts and remains with the challenger throughout. See, e.g., *Cooper*, 152 Ga. at 591 ("What such regulation shall be, and to what particular trade or business such regulation shall apply, are questions for the state to determine, and their determination comes within the proper exercise of the police power of the state"; there must be "clear and palpable" conflict before "an act of the legislature will be declared unconstitutional"); *Bramley*, 187 Ga. at 832 (referencing the "duty of sustaining [an] act

---

[11] None of our prior cases resolving state due process challenges to occupational licensing statutes expressly adopted the federal due process test, which generally gives extraordinary deference to the legislature in determining whether a stated interest is legitimate. Therefore, our prior cases applying that test to state due process challenges in other contexts are not controlling here. See, e.g., *Women's Surgical Ctr., LLC v. Berry*, 302 Ga. 349, 354-355 (806 SE2d 606) (2017) (applying federal due process test to state constitutional due process challenge to statute requiring certificate of need for new healthcare facility); *Quiller v. Bowman*, 262 Ga. 769, 770-771 (425 SE2d 641) (1993) (applying federal due process test to state constitutional due process challenge to state statute requiring suspension of driver's license upon conviction for possession of controlled substance or marijuana).

unless its invalidity is clear and palpable"); see also *Richardson,* 188 Ga. at 175 ("Reasonableness as such is not a primary matter of inquiry . . . . [T]he violation of the constitution may arise from unreasonableness if it extends to the point of arbitrariness or consists in unlawful discriminations.").

Indeed, not every burden on the ability to pursue a lawful occupation will be unconstitutional — sometimes a regulation will be "rational" in the sense that it is reasonably necessary (either actually or because of the failure of the challenger to meet her burden). See, e.g., *Cooper,* 152 Ga. at 593-594 (rejecting a challenge to an occupational regulation of barbers to prevent "[t]he spread of disease by unsanitary . . . barber shops"). But if the challenger can establish that a regulation imposing restrictions on a lawful occupation does not advance the articulated public purpose by means that are reasonably necessary for that purpose, then the regulation cannot stand. See *Bramley*, 187 Ga. at 834 ("The regulation of a lawful business . . . is dependent upon some reasonable necessity for the protection of the public health, safety,

24

morality, or other phase of the general welfare . . . ."); *Cooper,* 152 Ga. at 591 (regulation of trades is general within the police power of the legislature unless the ability to pursue an occupation is "unnecessarily and in the main arbitrarily interfered with").

4. With this framework in mind, we begin with the first step, which requires answering two questions: (a) whether Plaintiffs have established that they are engaged in a lawful profession as lactation care providers; and (b) whether the Act actually burdens them in their practicing of a lawful profession.

(a). The Secretary makes no argument that the profession of lactation consultant is not a legal occupation, and indeed the General Assembly has specifically "acknowledge[d] that the application of specific knowledge and skills relating to breastfeeding is important to the health of mothers and babies." OCGA § 43-22A-2. We thus conclude that Plaintiffs have met their burden of showing that there is no genuine issue of material fact as to that issue.

(b). We next address Plaintiffs' contention that the Act imposes burdens on practicing their chosen profession as lactation care

providers. As noted above, only lactation care providers who hold an IBCLC license are permitted to practice "lactation care and services," under the Act,[12] and "[l]actation care and services" are defined as "the clinical application of scientific principles and a multidisciplinary body of evidence for evaluation, problem identification, treatment, education, and consultation to childbearing families regarding lactation care and services." OCGA § 43-22A-3 (5). Additionally, the Act sets forth a nonexhaustive list of activities that constitute lactation care and services. See above at 7-8; OCGA § 43-22A-3 (5) (A)-(F).[13]

---

[12] OCGA § 43-22A-11 provides that a person who falls within one of the exemptions set forth in OCGA § 43-22A-13 is not prohibited from practicing lactation care and services. Those exemptions cover individuals licensed to practice other healthcare professions, such as dentistry and medicine, when incidental to the practice of their profession; doulas and perinatal and childbirth educators, when performing education functions consistent with the standards of their professions; students under the supervision of an ICBLC or other licensed healthcare professional; certain state and federal government employees when in the discharge of their official duties; volunteers; nonresident ICBLCs; and other healthcare professionals seeking licensure for their professions. It is undisputed that Plaintiffs do not fall within one of the exemptions.

[13] Because "lactation care and services" is defined, circularly, as the provision of "lactation care and services," the enumeration of specific activities is helpful to an understanding of the contours of the Act.

In considering whether the language of the Act covers Plaintiffs' professional activities, we begin with the statutory text and read it "in its most natural and reasonable way, as an ordinary speaker of the English language would." *Zaldivar v. Prickett*, 297 Ga. 589, 591 (774 SE2d 688) (2015). Here, although "clinical" is not defined in the Act, it has a common and well-understood meaning as "of, relating to, or conducted in or as if in a clinic: such as (a) involving direct observation of the patient [or] (b) based on or characterized by observable and diagnosable symptoms." Merriam-Webster Dictionary (7th paperback ed. 2016).[14] And this definition is consistent with the definition applicable in the healthcare setting as well. See Dorland's Illustrated Medical Dictionary (28th ed. 1994) (defining "clinical" as "pertaining to a clinic or to the bedside; pertaining to or founded on actual observation and treatment of patients, as distinguished from theoretical or basic sciences"). Thus,

---

[14] When looking for the commonly understood meaning of a word in statutory text, we generally look to dictionaries and, if relevant, legal dictionaries from the time the statute was passed. See *State v. Henry*, 312 Ga. 632, 637 (864 SE2d 415) (2021).

"clinical application" in the context of the provision of lactation care means services that are provided directly by a care provider to breastfeeding mothers.

The trial court did not determine whether the Act burdens Plaintiffs in the practice of their profession, but it did conclude that "not all lactation care providers are providing care that rises to the statutory definition of 'lactation care and services,'"[15] based on its conclusion that the phrase "clinical application" excludes breastfeeding education from the scope of "lactation care and services." Similarly, the Secretary argues that Plaintiffs may continue their work as "lactation peers and counselors" because such work is not a clinical service.[16]

However, the record indisputably shows that the vast majority

---

[15] This conclusion appears to be inconsistent with the trial court's determination in ruling on the equal protection claim that "all non-IBCLC providers are similarly situated to IBCLC providers because they perform the same type of work."

[16] The Secretary's argument contradicts, without explanation, the official opinion of Georgia's Attorney General that a person who is certified as a CLC and who does not fall within one of the Act's exemptions is prohibited from performing the type of services covered under the Act. See Op. Atty. Gen. 2018-1 (Jan. 24, 2018).

of the work Plaintiffs are paid to do in working as lactation care providers involves direct observation of, and interaction with, mothers and their nursing babies and includes one or more of the activities specifically enumerated as "lactation care and services." Moreover, the trial court's determination and the Secretary's argument ignore the plain meaning of "clinical" as working directly with patients as well as the inclusion of "lactation education to parents" within the Act's definition of lactation care and services. See OCGA § 43-22A-3 (5) (E). Furthermore, the undisputed evidence establishes that the scope of the services that CLCs are trained to perform includes comprehensive assessment of mothers and their babies related to breastfeeding; the development of an evidence-based care plan specific to the needs identified in the assessment; implementation of that care plan; and an evaluation of the effectiveness of breastfeeding and milk transfer. Each of these services falls within the statutory definition of lactation care and services enumerated in OCGA § 43-22A-3 (5) (A)-(F).

And while the record indicates that the scope of practice of

29

individuals trained by ROSE is not as comprehensive as the scope of practice of a CLC or an IBCLC, the record does establish that lactation care providers trained by ROSE work directly with mothers to provide education about breastfeeding and how to be successful in breastfeeding their babies.

Finally, while the evidence shows that there are significant differences in the training required to receive certification as an IBCLC or CLC or to be trained as a lactation care provider by ROSE, these differences are not dispositive. The real question is whether Plaintiffs' professional activities meet the Act's definition of "lactation care and services" as including the application of "scientific principles and a multidisciplinary body of evidence for evaluation, problem identification, treatment, education, and consultation . . . regarding lactation care and services." OCGA § 43-22A-3 (5). And Plaintiffs' professional activities do meet that definition. Indeed, the evidence shows that the training provided by the Healthy Children Project (for certification as a CLC) and by ROSE includes, at a minimum, education in "scientific principles

30

and a multidisciplinary body of evidence" to equip them to provide lactation education directly to mothers. Accordingly, we conclude that (even in the light most favorable to the Secretary) Plaintiffs have met their burden of showing that the Act in fact imposes significant burdens on them in providing lactation care and services for remuneration.

5. We must next consider whether the State has a sufficient interest in restricting the provision of lactation care and services for compensation only to individuals who have attained certification as an IBCLC.

(a). The Act's stated purpose is "to protect the health, safety, and welfare of the public," OCGA § 43-22A-2, which is, at least on its face, a well-recognized basis for legislative enactments dealing with the ability to pursue a lawful occupation.[17] See, e.g., *Bramley*, 187 Ga. at 834-835 (recognizing that there "are many occupations

---

[17] As noted above, another well-recognized basis for occupational licensing schemes exists where occupations "afford peculiar opportunity for imposition and fraud." *Bazemore*, 121 Ga. at 619. The Secretary makes no argument that the occupation of lactation care provider is one that offers a peculiar opportunity for fraud.

which may be regulated for the promotion of the public welfare"). But Georgia's Due Process Clause requires more than a talismanic recitation of an important public interest. Moreover, as discussed above, our cases make clear that a challenger need not negate every conceivable basis for an occupational licensing scheme. Therefore, we focus our analysis on the Secretary's proffered rationale for the Act – promoting access to quality care.[18]

As *Bramley* makes clear, a generic interest in promoting access to quality services — at least in the absence of a unique tie to the provision of lactation care and services — is *not* a sufficient interest for these purposes. In *Bramley,* this Court considered a constitutional challenge to a statute requiring that photographers obtain a license to engage in commercial photography and photofinishing. To obtain the license, a photographer was required to pass a written examination given by a newly formed State Board of Photographic Examiners and to "qualify as to competency, ability,

---

[18] The Secretary's focus on "quality" care is consistent with the Act's statement that the "rendering of sound lactation care and services . . . requires trained and competent professionals." OCGA § 43-22A-2.

32

and integrity." Id. at 833. Bramley, whose work involved soliciting orders for the enlargement and tinting of photographs by his employer, was prosecuted for violating the statute because neither he nor his employer were licensed under the statute. Id. at 833-834. Bramley challenged the constitutionality of the statute, and we concluded that there was no "basis affecting the public interest for the requirement of examination 'as to competency, ability, and integrity.'" Id. at 834. We expressly rejected the notion that the statute might be upheld under the theory that an unskilled photographer producing inferior quality prints might cause some injury to the public or that a dishonest photographer might commit fraud. Id. at 838; see also *Richardson,* 188 Ga. at 174-175 (the police power did not allow the government to subject an electrician "to the judgment of a board . . . for the purpose of determining whether he may be reasonably expected to satisfactorily complete any contracts he enters into" (cleaned up)).

In contrast, where this Court has upheld regulatory laws intended to further public health, safety, and welfare, the regulation

has been reasonably necessary to advance a specific health, safety, or welfare concern. For example in *City of Lilburn v. Sanchez*, 268 Ga. 520, 522-524 (491 SE2d 353) (1997), we upheld a municipal ordinance forbidding the keeping of a pot-bellied pig as a pet on a lot of less than one acre where direct and expert evidence showed distinct harm to the health and welfare of neighbors and the public from keeping a pet pig on smaller lots. See also *Bazemore,* 121 Ga. at 620-621 ("When stolen from the field of the owner, [seed-cotton] is almost impossible to be identified. It is therefore especially difficult to make laws relating to larceny or receiving stolen goods effective in preventing the crime [of stealing it] by punishing the thief," making a law requiring the written consent of the owner of land a valid exercise of the police power.).

In summary, the question is (at a minimum) whether the particular trade is peculiarly "infected with some quality that might render it dangerous to the morals, the health, the comfort[,] or the welfare of . . . the public." *Bramley,* 187 Ga. at 836. Thus, it may well be true that regulations promoting quality care are desirable as a

policy matter, but that is not a sufficient interest to justify an unreasonable burden on the ability to pursue a lawful occupation.

(b). Applying the above principles to the evidence presented below, we conclude that the Secretary's proffered interest in the restrictions imposed by the Act — promoting access to quality care — is an insufficient basis upon which to authorize only IBCLCs to provide lactation care and services for compensation given our consistent and definitive understanding of the scope of the due process right to practice one's chosen profession free from unreasonable government restrictions. The Secretary does not contend that the Act is inherently a health and safety regulation — that, say, unlicensed lactation consultants would do affirmative *harm* (in the way a surgeon might), as opposed to merely failing to help, their patients. Certainly, there is nothing inherently harmful in the practice of lactation care, and there is no evidence of harm to the public from the provision of lactation care and services by individuals who lack an IBCLC license. Compare *Coker*, 188 Ga. at 174 (acknowledging obvious risk of fire from defectively installed

35

electrical wiring and so authorizing regulation of installation of electrical wiring for safety of public).

Moreover, the record supports the trial court's conclusion that CLCs and the individuals educated by ROSE are trained to provide safe and competent lactation care and services within their respective scopes of practice. The Secretary admitted that he is not aware of any evidence of harm from a person providing lactation care and services either prior to or after the passage of the Act and that the advisory group set up under the Act, see OCGA § 43-22A-4, has not received any complaints regarding untrained or incompetent providers of lactation care and services. And careful review of the affidavits and depositions of experts and lactation care providers entered into the record fails to reveal any injury to mothers or babies caused by lactation care providers of any type. Finally, we note that the record contains the Review Council's report of the 2013 version of the Act. That report concludes that there is evidence that having access to proper lactation support has many benefits; that in its review, which included hearings, there was "no substantive evidence

of harm identified" that flowed from the unregulated provision of lactation care; and that prohibiting CLCs from providing lactation care may cause "a greater risk of harm because the majority of lactation consultant providers would no longer be able to provide care."

In the absence of evidence of harm, the Secretary relies on speculation to suggest that there is a danger to breastfeeding mothers and nursing babies from "unqualified and untrained" lactation care providers. At oral argument, the Secretary contended that a lactation care provider without the IBCLC certification might lead to the premature cessation of breastfeeding, which would result in the baby and mother not receiving the benefits of breastfeeding[19] or to the continuance of breastfeeding that is inadequate for a baby's nutritional needs. Such speculation, in the face of substantial

---

[19] The rationale that regulation of a legal occupation is needed because incompetent practitioners could lead to a reduction in the public having access to the occupation could be used to justify any licensing regime. See *Bramley*, 187 Ga. at 838 (reasoning that if licensing requirement for photographers were determined to be valid "it would seem that there is scarcely any kind of business, however innocent and harmless, to which similar regulations might not be applied").

evidence that the provision of lactation care and services by non-IBCLC providers is safe for and beneficial to nursing mothers and babies, is insufficient to authorize the regulatory scheme adopted, which greatly restricts those able to be employed as lactation care providers.[20]

For the foregoing reasons, we conclude that the Act violates Plaintiffs' due process rights under the Georgia Constitution to practice the chosen profession of lactation care provider. Accordingly, we reverse the trial court's rulings on the due process claim. Because we have determined that the Act is unconstitutional

---

[20] We note that while statutes in other states provide for the licensing of lactation care providers, no other state has enacted a statutory scheme that categorically prohibits a CLC from providing lactation care services for compensation, contrary to the Secretary's assertion. See Or. Rev. Stat. § 676.681 (2) (c) (Lactation Consultant Act does not prohibit any "person whose training and national certification attest to the person's preparation and ability to practice their profession or occupation from practicing the profession or occupation in which the person is certified, if the person does not represent that the person is a lactation consultant"); N.M. Stat. Ann. § 61-3B-1 et seq. (establishing licensing of lactation care providers, including for persons certified "by a certification program accredited by any nationally or internationally recognized accrediting agency" if approved by state's board of nursing, and providing that Lactation Care Provider Act shall not prevent practice of lactation care and services by unlicensed persons so long as they do not represent themselves as licensed providers).

on one of the grounds asserted, we need not address Plaintiffs'

arguments that the trial court erred in ruling that the Act does not

violate their equal protection rights under the Georgia Constitution.

Accordingly, we vacate the trial court's ruling in S23A0017.

*Judgment reversed in Case No. S23X0018. Judgment vacated in Case No. S23A0017. All the Justices concur, except Pinson, J., disqualified.*